AO 106 (Rev. 06/09) Application for a Search Warrant

FILED

MAR 2 7 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*   )
*or identify the person by name and address)*     )          Case No.
                                                  )
154 Daisy Avenue, Apt #C                          )      **19MJ1260**
Imperial Beach, CA 91932                          )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-7 (incorporated by reference).

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841(a)(1) and 846. | Possession of Controlled Substances with intent to Distribute and Conspiracy to Distribute Controlled Substances |

The application is based on these facts:
See attached Affidavit of DEA Special Agent Leo Tanlu (incorporated by reference).

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Leonell Tanlu_
*Applicant's signature*

_Leonell Tanlu_
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **3/26/19**

_Bernard Skomal_
*Judge's signature*

City and state:  San Diego, California

Hon. Bernard G. Skomal, United States Magistrate Judge
*Printed name and title*

**ATTACHMENT A-7**

1. **Target Location 7** is located at 154 Daisy Avenue, Apt. #C, Imperial
   Beach, California 91932.  **Target Location 7** is a light colored, two-story,
   multi-unit complex with the front facing south.  The numbers "**154**" are
   displayed on the right half of **Target Location 7.**  **Target Location 7** is the
   furthest right (northeast) bottom unit before the alleyway at the rear of
   the complex with a dark colored door and metal screen facing west with
   the letter "C" on the front door.



# **ATTACHMENT B**

## ITEMS TO BE SEIZED

1.     Controlled substances, paraphernalia for packaging, weighing, cutting, testing, distributing and manufacturing controlled substances.

2.     Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

3.     Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

4.     Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, personal identification documents and documents relating to obtaining

1  false identification including birth certificates, drivers license, immigration cards and other
2  forms of identification which the same would use other names and identities other than his
3  or her own.

4

5  5.   All incoming telephone calls received at the residence during the execution of the
6  search warrant and all calls received on cellular telephones found during the execution of
7  the warrant.

8

9  6.   Devices used to conduct counter surveillance against law enforcement, such as radio
10  scanners, police radios, surveillance cameras and monitors and recording devices and
11  cameras.

12

13  7.   Photographs and video and audio recordings which document an association with
14  other coconspirators and/or which display narcotics, firearms, or money and proceeds from
15  narcotics transactions.

16

17  8.   Police radio scanners, pagers, cellular telephones, facsimile machines, telephone
18  answering machines, Caller ID system, and prepaid telephone cards associated with the
19  following individuals:

20      ~~Dat Pham Tien TRAN aka "Damian,"~~ _hs_ 3/20/19
21      ~~Heather ODOM,~~ _ho_ 3/26/19
22      ~~DARREN Pham Tran aka "Denny,"~~ _hs_ 3/26/19
23      ~~Anthony VIBOUNPHONH aka "Ant,"~~ _ht_ 3/26/19
24      ARMANDO Angeles,
25      ~~Kristine Tuyetvan TRUONG aka "K,"~~ _hs_ 3/26/19
26      ~~Eric ANGELES~~ _he_ 3/26/19
27
28                                  2

1  The evidence to be seized under the following paragraphs 9 – 13 shall be limited to the
2  period of January 14, 2017 to the present *and must be associated with the*
3  *individual listed above. as 3/26/19*

4  9.      Travel documents including itineraries, airline tickets, boarding passes, motel and
5  hotel receipts, rental car receipts, passports and visas, credit card receipts, shipping and
6  receiving documents relating to the delivery of packages.

7

8  10.     Banking and financial institution records, bank statements, credit card statements,
9  canceled checks, money orders, deposit slips, orders for or receipt of money transfer by
10  wire, checking and saving books, financial institution statements, safe deposit boxes, loan
11  statements, tax returns, business and personal ledgers, and accounting records.

12

13  11.     Records relating to the lease of storage lockers, telephone/address directories and
14  other papers containing telephone numbers and addresses.

15

16  12.     Records related to the purchase of real estate, vehicles, precious metals, jewelry and
17  other tangible assets.

18

19  13.     Authorization to search the cellular telephone includes the search of disks, memory
20  cards, deleted data, remnant data, slack space, and temporary or permanent files contained
21  on or in the cellular telephone.  The seizure and search of the cellular telephone will be
22  conducted in accordance with the affidavit submitted in support of the warrant. With
23  respect to any and all electronically stored information in cellular phones and PDAs, agents
24  may access, record, and seize the following:

25         a.      telephone numbers of incoming/outgoing calls stored in the call registry;

26         b.      Digital, cellular, and/or telephone numbers and/or direct connect numbers,
27  names and identities stored in the directories;

28                                                3

1       c.     Any incoming/outgoing text messages relating to violations of 21 U.S.C. §§

2  841(a)(1) and 846;

3       d.     telephone subscriber information;

4       e.     the telephone numbers stored in the cellular telephone and/or PDA; and

5       f.     any other electronic information in the stored memory and/or accessed by the

6  active electronic features of the digital or cellular phone including but not limited to

7  photographs, videos, e mail, and voice mail relating to violations of 21 U.S.C. §§ 841(a)(1)

8  and 846.

4

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION**

I, Leonell Tanlu, being duly sworn under oath, declare and state:

**EXPERIENCE AND TRAINING**

1.     I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. §§ 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.     I am a Special Agent (SA) with DEA and have been so employed since 2004. I am currently assigned to the DEA San Diego Division Office. I have received formal training and have experience in narcotics and gang investigations. I have participated in multiple separate investigations involving the distribution of controlled substances and firearms. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, court authorized interceptions, pen register/trap and trace devices, telephone toll analysis, undercover operations, physical searches, mail covers, and electronic examinations of evidence. I have monitored numerous calls and meetings with persons under investigation, including wiretap communications of drug traffickers and gang members and associates. I have worked alongside and consulted with many law enforcement officials and other professionals experienced in drug and gang investigations. Based on my training and experience, I am familiar with how drug traffickers and gang members communicate and operate. For example, I am aware that drug traffickers and gang members discuss criminal matters over the telephone and often use coded or vague language. I am aware of how drug traffickers and gang members organize and operate their illegal activities, including the use of locations, vehicles, and other resources in the furtherance of the illegal activities. I am familiar with the typical make up and operation of gangs and drug trafficking organizations including the distribution, storage, and transportation of the drugs, the collection of money which represents the proceeds of drug trafficking and other criminal activity, and money laundering.

3.     The following is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillance, interviews, database and public records checks, searches, telephone toll analysis, and other investigation. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested warrant. Conversations and discussions below are set forth in substance unless noted.

### REQUESTED SEARCH WARRANTS

4.     I submit that the facts contained herein demonstrate probable cause to believe that the fruits, instrumentalities and evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute Controlled Substances); Title 21, United States Code, Sections 841(a)(1) (Possession of Controlled Substances with intent to Distribute); Title 21, United States Code, § 843(b) (Unlawful Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance); and Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(h) (Conspiracy to Launder Monetary Instruments); more fully described in ATTACHMENT B; will be found at the residence (including the structure, all attached and unattached structures, rooms, attics, basements, garages, and parking spaces (including vehicles and trailers parked therein) assigned to or part of the location; storage areas, safes, briefcases, containers, trash areas within the location to be searched, surrounding grounds and outbuildings assigned to or part of the location) at the **Target Locations**:

  a. **Target Location 1**:  1988 Hazelwood Place, San Diego, CA 92105;

  b. **Target Location 2**:  (DROPPED FROM WARRANT APPLICATION)

  c. **Target Location 3**:  "City Pub" – 4977 El Cajon Boulevard, San Diego, CA 92115;

  d. **Target Location 4**:  4977 ½ El Cajon Boulevard, San Diego, CA 92115;

  e. **Target Location 5**:  6533 Lemerand Avenue, San Diego, CA 92115;

  f. **Target Location 6**:  6540 Lemerand Avenue, San Diego, CA 92115;

g.  **Target Location 7**:  154 Daisy Avenue, Apt. #C, Imperial Beach, CA 91932;

h.  **Target Location 8**: 4697 51st Street, Apt. #2, San Diego, CA 92115;

i.  **Target Location 9**:  4091 Winona Avenue, San Diego, CA 92105;

j.  **Target Location 10**: 4321 Altadena Avenue, San Diego, CA 92115;

k.  **Target Location 11**: 6832 Upton Court, San Diego, CA 92111;

l.  **Target Location 12**:  701 W. Beech Street, Apt. #2203 San Diego, CA 92101;

m.  **Target Location 13**: 4747 Crooked Creek, San Diego, CA 92113.

This affidavit is submitted in support of search warrant applications for **Target Location 5**, **Target Location 6**, **Target Location 7**, **Target Location 8**, and **Target Location 9**, which are more fully described at Attachments A-5 thru A-9 (hereinafter collectively referred to as "**Target Locations**"). Because of the overlapping nature of the criminal activity, Crooked Angels **Target Locations 1, 3, 4, and 10 – 13**, are also referenced in this affidavit.  This affidavit incorporates by reference the Affidavits submitted in support of the applications for **Target Locations 1, 3, 4, and 10 – 13**.

### FACTS ESTABLISHING PROBABLE CAUSE

**A.  Investigation Background**

5.  The "Crooked Angels" investigation targeted gang members and affiliates who are involved in the distribution of controlled substances in San Diego and out of state.  The gangs involved include: Oriental Crips; Tiny Rascal Gang; Oriental Killer Boys; Viet Boys; and Linda Vista 13.  The investigation Target Subjects, however, ignored gang affiliation while distributing drugs and readily distributed drugs to individuals affiliated with rival gangs.  The Target Subjects engaged in drug distribution at their residences in the City Heights, College Grove and Imperial Beach communities in San Diego.

6.  During the investigation, law enforcement learned that several of the Target Subjects were involved in the distribution of prescription opioids.  Additionally,

investigators determined that several of the Target Subjects were involved in the distribution of counterfeit prescription opioids laced with Carfentanil. Investigators determined that one individual died as a result of ingesting the Carfentanil and another individual was seriously injured.

7.    Additionally, several of the Target Subjects distributed marijuana to locations along the eastern seaboard using United Parcel Service (UPS) and the United States Postal Service. Investigators identified Manoxay INSISIENMAY as the principle marijuana distributor who obtained marijuana from marijuana grow operations in the Central District of California and then distributed it locally or shipped it out of state. INSISIENMAY operated from a local drinking establishment "City Pub" on El Cajon Boulevard. Investigators learned that the Target Subjects processed and packaged marijuana at the apartment attached to the rear of the "City Pub." Investigators seized numerous parcels containing marijuana destined for Maryland where other individuals distributed the marijuana. Investigators also seized parcels containing drug proceeds mailed from out of state locations to San Diego. During the investigation, investigators identified several individuals operating funnel accounts[1] on behalf of INSISIENMAY. Drug distributors on the east coast made cash deposits into the funnel accounts then the Target Subjects withdrew the cash in San Diego. Investigators identified in excess of $100,000 in cash transactions through the funnel accounts. Investigators executed three marijuana-grow search warrants in the Central District of California and seized over 7000 marijuana plants. In addition, investigators executed a search warrant at an Air BnB and seized over $50,000 from out of state marijuana buyers who traveled from Florida to San Diego to buy marijuana.

//

//

---

[1] A "funnel account" is a financial account used by drug traffickers to accept cash deposits of drug sale proceeds in one location that is later withdrawn from a different location.

4

**B.   Indictment**

8.   On March 14, 2019, a federal grand jury in the Southern District of California, returned three sealed indictments.  The three indictments charged twenty defendants.  The indictments allege violations of: Title 21, United States Code, Sections 841(a)(1) and 846, Conspiracy to Distribute Controlled Substances; Title 21 United States Code, Section 841(a)(1), Possession of Cocaine/Methamphetamine With Intent to Distribute; Title 21, United States Code, Section 841, Distribution of Carfentanil Resulting in Death; and Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(h), Conspiracy to Launder Monetary Instruments.   The indicted individuals include:

> Dat Pham Tien Tran aka "Damian,"
> Darren Pham Tran aka "Denny,"
> Anthony Vibounphonh aka "Ant,"
> Armando Angeles,
> Kristine Tuyetvan TRUONG aka "K,"
> Nalong KEOMANIVONG aka "Elmo,"
> Minh PHAM,
> Javier PENALOZA,
> Jimmy SENGPASEUTH,
> Nava Jeff PHETHDARA,
> Eric ANGELES
> Manoxay INSISIENMAY aka "Mano"
> Manosang INSISIENMAY aka "Dustin"
> Amphone VINSON
> Daorine DETHAMPHAIVAN aka "Tik"
> Egzon HAXHIJA aka "X" aka "Florida"
> Troy COOLEY
> Linda INSISIENMAY
> Malive PARKER
> Heather ODOM

**C.   Wiretaps**

9.   On May 13, 2017, United States District Judge Janis L. Sammartino, Southern District of California, issued an Order authorizing the interception of communications to and from a telephone used by Anthony VIBOUNPHONH aka "Ant" (hereinafter "TT1"), and a telephone used by Nalong KEOMANIVONG aka "Elmo" hereinafter "TT2").

10. On August 31, 2017, Judge Sammartino, authorized renewed interception of TT1 and initial interception of a telephone used by Minh Huu PHAM (hereinafter "TT3").

11. On March 1, 2018, Judge Sammartino, authorized the initial interception of communications to and from telephones used by: Manoxay INSISIENMAY aka "Mano" (hereinafter "TT4"); Nava Jeff PHETHDARA (hereinafter "TT5"); Armando ANGELES aka "Mando" (hereinafter "TT6"); Javier PENALOZA (hereinafter "TT7"), and Kristine TRUONG (hereinafter "TT8").

12. On April 27, 2018, Judge Janis L. Sammartino, authorized the renewed interception of TT4, TT6, TT7, and the initial interception of a telephone used by Dat TRAN aka "Damien" (hereinafter "TT9"); a second telephone used by Manoxay INSISIENMAY aka "Mano" (hereinafter "TT10"), and a second telephone used by Javier PENALOZA (hereinafter "TT11").

## TARGET LOCATIONS 5, 6, 7, 8, and 9

13. Investigators learned that ARMANDO Angeles, Anthony VIBOUNPHONH, DARREN Tran, Kristine TRUONG and Dat TRAN were involved in a conspiracy to distribute prescription opioids and counterfeit prescription opioid pills containing carfentanil.

14. **Target Location 5** is the residence of Dat Pham Tien TRAN (hereinafter "TRAN") (TT9), Darren TRAN (hereinafter "DARREN"), and Heather ODOM. TRAN distributed drugs from **Target Location 5**. On October 15, 2017, emergency medical response personnel transported DARREN Tran from **Target Location 5** to a hospital where he was treated for opioid overdose. On November 6, 2017, Caitlyn O'Neil overdosed at **Target Location 5** and emergency personnel transported her to Alvarado Hospital for treatment. Further, on March 13, 2018 and May 4, 2018, while cooperating with investigators, O'Neil made controlled purchases of cocaine from TRAN at **Target Location 5**. DARREN Tran and Dat TRAN are brothers.

15.     During recent surveillance efforts on March 3, 8, 9, 11, and 19, 2019, investigators observed TRAN's white truck parked in front of **Target Location 5**. This was the same truck TRAN used to deliver drugs. On March 13, 2019, investigators observed DARREN arrive and enter **Target Location 5**.

16.     **Target Location 6** is the residence of Eric ANGELES. **Target Location 6** is located diagonally across the street from **Target Location 5**. During the March 13, 2018, controlled buy, investigators observed Eric ANGELES walk from the direction of **Target Location 6** to deliver cocaine to Dat TRAN at **Target Location 5**. As recently as March 13, 2019, investigators observed Eric ANGELES exit **Target Location 6** in order to take out the trash.

17.     **Target Location 7** is the residence of ARMANDO Angeles. ARMANDO Angeles is the brother of Eric ANGELES. As recently as March 16, 2019, investigators observed ARMANDO Angeles at **Target Location 7**. During this same surveillance activity, investigators saw Armando ANGELES' vehicles parked at the rear of **Target Location 7** and at the front curbside of **Target Location 7**.

18.     **Target Location 8** is the residence of Anthony VIBOUNPHONH. During surveillance efforts on March 8, 9, 11, 15, 16, and 19, 2019, investigators observed VIBOUNPHONH's vehicle at **Target Location 8**. Investigators saw the vehicle parked in different locations near **Target Location 8** on those dates.

19.     **Target Location 9** is the residence of Kristine TRUONG. While conducting surveillance on March 3, 9, 11, 15, 16, 18, and 19, 2019, investigators observed TRUONG's vehicle at **Target Location 9**.

### *January 14, 2017 – 56-gram Controlled Cocaine Buy from KEOMANIVONG and VIBOUNPHONH*

21.     On January 14, 2017, investigators conducted a controlled purchase of two ounces of cocaine from Anthony VIBOUNPHONH and Nalong KEOMANIVONG using an undercover law enforcement agent (hereinafter "UC"). UC called, and exchanged text messages with, KEOMANIVONG while setting up the buy. Ultimately,

1  UC and KEOMANIVONG agreed to meet at Fry's Electronics Store in San Diego to
2  conduct the buy. Investigators established surveillance in advance of the controlled
3  buy.   Investigators saw KEOMANIVONG and VIBOUNPHONH arrive at the meet
4  location and they approached the UC vehicle. KEOMANIVONG introduced UC to
5  VIBOUNPHONH and then handed UC a plastic bag containing approximately two
6  ounces of cocaine.  UC then gave KEOMANIVONG $2400 for the two ounces of
7  cocaine. Thereafter, KEOMONIVONG and VIBOUNPHONH left the area.[2]  The DEA
8  Lab determined that the substance was 56 grams of cocaine.

9  ### *Cynthia Kashiwagi's Overdose Death*

10  22.    During the early morning hours of September 3, 2017, DARREN Tran,
11  aka "Denny," found his girlfriend, Cynthia Kashiwagi, in her car, dead from an
12  overdose.  San Diego Police Department officers responded to the scene at 6120
13  Broadway Avenue, San Diego, California, less than half a mile from Kashiwagi's
14  residence.  Kashiwagi had blisters on her face, arms and stomach.  Based on the
15  available evidence, it is likely that Kashiwagi died during the day on September 2, and
16  remained in her car until found by DARREN Tran at about 1:00 a.m. on September 3.
17  The San Diego County Medical Examiner ruled that the cause of death was acute
18  carfentanil and tramadol intoxication (overdose) with environmental hyperthermia
19  listed as a contributing factor.

20  23.    Officers interviewed DARREN Tran on scene.  Kashiwagi was DARREN
21  Tran's girlfriend, and at the time of her death, they had been dating for several years.
22  The body worn camera footage shows DARREN in an emotionally agitated state.
23  Officers repeatedly directed DARREN to stay seated, away from Kashiwagi's body.
24  Eventually, officers asked Kashiwagi's mother, Angeline Kashiwagi, to calm him
25  down.    Officers were ultimately able to question DARREN while he was calm.

26

27  [2] Unless otherwise noted, all controlled buys followed standard protocols: agents searched cooperators and
    vehicles before and after the operation; agents equipped the cooperators/undercover agents with recording
28  devices; and agents provided buy money for the drugs.

8

DARREN said that he received a text message from one of Kashiwagi's co-workers indicating that she missed a meeting at work. He traveled to her work location, then used a cell phone application that showed her location. When DARREN arrived, Kashiwagi was slumped over the steering wheel. DARREN called 911, then pulled her out of the car and began CPR. DARREN further said Kashiwagi was a seven-year recreational user of opiates and usually took tramadol. DARREN explained that she usually took pills that were 25 to 50 milligrams, and she took one-half to one full pill at a time.

24.    DARREN gave consent to an officer to view his text message conversation with Kashiwagi on his cell phone. The officer asked about a text message exchange with Kashiwagi in regards to DARREN being recently hospitalized. DARREN asked for his phone back and said he did not want to talk about it.

25.    Angeline told officers she last saw her daughter at 9:00 a.m. on September 2, 2018. Angeline further stated that her daughter left their residence to go to bar class in Point Loma. Angeline became worried when she did not hear from her daughter all day, which was not normal. Angeline attempted to call Kashiwagi but she did not answer. Angeline stated that Kashiwagi had no medical issues or allergies and she did not know if Kashiwagi had a drug or alcohol history.

### ***Kashiwagi Cell Phone Download***

26.    On June 26, 2018, investigators obtained a state search warrant for Kashiwagi's cell phone. The search revealed numerous text messages between, Kashiwagi and DARREN Tran and Dat TRAN. The drug related text messages extend over a 10-month period. Further, a review of "Signal" text message exchanges revealed numerous text messages between Kashiwagi and Dat TRAN. The downloaded communications indicated that DARREN and Kashiwagi obtained controlled substances from Dat TRAN. The communications contained explicit references to the quantities and milligram level of the prescription opioids. Further, the communications specifically referenced "fake ones" in reference to the counterfeit

9

opioids Dat TRAN distributed to DARREN and Kashiwagi. For example, Kashiwagi sent a text to Dat TRAN on February 25, 2017 at 10:12 a.m., "Hey Dat can we get 30 40s?" Investigators believe this text was asking for 30 pills containing 40 milligrams of oxycodone.

27.  In a later text from Kashiwagi to Dat TRAN on August 26, 2017 at 11:04 a.m., "Hey I was thinking about ur call last night. Honestly I would rather have him do the real stuff than the fake ones bc we don't know what they're made of & he knows his limit with the real ones. he was sniffing it bc he couldn't feel them. So don't tell the guy not to give it to him. Let him do what he wants until he can go to his doctor. But keep him away from your stuff. We need to bid some time before then so he doesn't dig himself into a deep depression. He's already feeling really down about yesterday." Investigators believe that "fake ones" refers to counterfeit opioids containing carfentanil. Investigators know that DARREN overdosed and was taken to the hospital on August 25, 2017. Investigators believe that this message indicates that Dat TRAN distributed counterfeit prescription opioids to DARREN and he overdosed

28.  In Kashiwagi's web history, there were 1,589 searched items. When TFO James typed Fentanyl in the search, it showed Kashiwagi searched the words "Fentanyl pill" on July 2, 2017. There were 12 separate entries. On the same day, Kashiwagi also searched "deadly dose of fentanyl" and "fake Fentanyl pills."

### *VIBOUNPHONH, TRUONG and A. ANGELES Intercepted Calls*

29.  Investigators intercepted calls establishing the existence of a drug distribution conspiracy as early as May of 2017. Investigators were not intercepting any Target Telephones at the time of Kashiwagi's death. Investigators renewed interception of telephone number (619) 362-6135 (TT1) on September 7, 2017. Investigators intercepted several calls pertinent to the overdose death on TT1.

30.  On May 9, 2017, VIBOUNPHONH called one of his drug customers, Sonny, at 5:23 p.m. (TT1 session 266). During the conversation, VIBOUNPHONH

10

1  expressed confusion about whether his sister found his "coke" or pills because he has a
2  bunch of pills and a "rock" (cocaine) piece.

3      31.     On May 9, 2017, at 6:33 p.m., VIBOUNPHONH called "Jay" (TT1 session
4  290).  During that conversation, VIBOUNPHONH and Jay discussed the cost of
5  obtaining a "boat" (1000 pills) of "xans" from Mexico.  Further, they discussed
6  traveling to Tijuana to obtain the drugs from doctor related to one of their acquaintants.
7  The next day, (TT1 session 377) VIBOUNPHONH and Jay agreed to meet up to
8  conduct a drug transaction.

9      32.     On May 9, 2017, at approximately 6:45 p.m., a drug customer, "Josh,"
10  called VIBOUNPHONH (TT1 session 293).  During that conversation, Josh asked
11  VIBOUNPHONH about the availability of "perks" (Percocet).  VIBOUNPHONH
12  replied that he was looking for those also and that they are not as readily available now,
13  as in the past.  Further, the parties discussed the current demand for Percocet, "everyone
14  [is] eating them."

15      33.     On May 15, 2017, VIBOUNPHONH called TRUONG, at 9:20 p.m. (TT1
16  session 1252). TRUONG and VIBOUNPHONH first discuss pills available from
17  TRUONG's source.  TRUONG explained that she had "15 of the brown" and "20 of
18  the white." VIBOUNPHONH then told TRUONG that he had 10 milligram Oxycodone
19  available for $5 per pill. TRUONG then asked VIBOUNPHONH to deliver $100 worth
20  (20 pills).

21      34.     During subsequent calls (TT1 session 1278 & 1279) VIBOUNPHONH
22  called TRUONG and confirmed his travel to, and arrival at, her residence.

23      35.     On September 12, 2017, at approximately 8:13 p.m., VIBOUNPHONH
24  called Dat TRAN.  VIBOUNPHONH asked Dat TRAN if he did all the viewing
25  (referring to Kashiwagi's funeral). VIBOUNPHONH then told Dat TRAN his "uncle"
26  was calling him, so VIBOUNPHONH needed to get some more money
27  (VIBOUNPHONH's drug source of supply fronted him drugs, VIBOUNPHONH in
28  turn fronted drugs to Dat TRAN, and now each is seeking to collect). Dat TRAN told

11

1  VIBOUNPHONH that he could pay $300. VIBOUNHPHONH said "okay," then
2  confirmed that Dat TRAN paid $1700 on one occasion, then $500 on another occasion
3  for a total of $2200. Dat TRAN agreed that he still owed VIBOUNPHONH $3800.

4      36.    On September 22, 2017, at approximately 12:49 p.m., VIBOUNPHONH
5  (TT1) called ARMANDO Angeles (TT6). VIBOUNPHONH stated, "My homie called
6  this morning. Denny (DARREN Tran) wants some blues (opioids/counterfeit opioids)."
7  ARMANDO Angeles asked, "How much is Denny looking for?" VIBOUNPHONH
8  stated, "Charge twenty ($20 per pill) and give me five ($5 per pill)."

9      37.    On September 22, 2017, at approximately 12:53 p.m., VIBOUNPHONH
10 called DARREN Tran. VIBOUNPHONH told DARREN that he could get some real
11 stuff for DARREN. VIBOUNPHONH told DARREN that "MANDO" (ARMANDO
12 Angeles) would come to DARREN "for 10" or if DARREN wanted to "grab more."
13 DARREN replied that he would get "30" since he was not sure when the "50" or the
14 "80" would come in. VIBOUNPHONH told DARREN, "the A215 is the real one."
15 (A215 refers to a 30mg Oxycodone pill. It is a round, blue pill.)

16     38.    On September 22, 2017, at approximately 12:55 p.m., VIBOUNPHONH
17 (TT1) called ARMANDO Angeles on TT6. VIBOUNPHONH stated, "Denny
18 (DARREN Tran) wanted thirty (30 pills) right now" and texted DARREN Tran's
19 telephone number to ARMANDO Angeles. ARMANDO Angeles asked, "How much
20 you want me to charge Denny?" VIBOUNPHONH said, "Twenty-five ($25.00 per
21 pill)." VIBOUNPHONH stated, "It's the only time I'm gonna deal for Denny because
22 Damien (Dat TRAN) is against it because his girlfriend (Kashiwagi) died from this
23 stuff."

24     39.    On September 22, 2017, at approximately 4:01 p.m., Armando ANGELES
25 (TT6) called VIBOUNPHONH (TT1). VIBOUNPHONH stated, "Denny looked really
26 messed up…He picked his skin….Shaking while trying to get out of the car."
27 ARMANDO Angeles said, "I felt so bad that I had to give Denny (DARREN Tran) a
28 prep speech that this thing could kill him." VIBOUNPHONH replied, "I know that…I

told you before about his girlfriend died because of it." ARMANDO Angeles stated, "I deleted all of Denny's texts and phone numbers  and that why I called you (VIBOUNPHONH) to make sure Denny was okay and not going to tell on me...I didn't want to give him (DARREN Tran) the bag because of my fingerprints were on it." VIBOUNPHONH replied, "Denny is the next step after addict...He od'd and was admitted to the hospital three weeks ago...Denny blamed it on Damien because he gave him the fake pill."   Based upon the intercepted conversations and the death of Kashiwagi, investigators believe ARMANDO Angeles distributed prescription opioid pills and counterfeit prescription opioids containing carfentanil. (On October 15, 2017, emergency medical technicians responded to DARREN's residence at 6533 Lemarand Avenue, **Target Location 5**.  According to EMS logs, DARREN's primary symptom was "altered mental status."  This is the same location where EMTs found DARREN unconscious and supine on August 25, 2017, and administered Narcan).

40.   On September 28, 2017, at approximately 1:18 p.m., VIBOUNPHONH (TT1) called TRUONG on TT8. TRUONG said, "I picked that up today. The blues (prescription opioids/counterfeit prescription opioids). Do you want them?" VIBOUNPHONH replied, "Definitely get them (pills)." TRUONG responded, "Sixty pills for nine hundred ($900)."

41.   On October 3, 2017, at approximately 8:28 p.m. TRUONG (TT8) called VIBOUNPHONH. VIBOUNPHONH stated, "I just pulled in right now."  TRUONG replied, "I'm here on the other side...where I parked last time."  Based upon the intercepted telephone calls, investigators believe TRUONG distributed opioid or counterfeit opioid pills containing carfentanil to VIBOUNPHONH for $900.

42.   On March 5, 2018, at approximately 2:35 p.m. (TT6 session #23), ARMANDO Angeles spoke to an unknown male about the availability of a variety of drugs including mushrooms, prescription opioids, and fentanyl-laced pills. ARMANDO Angeles asked the unknown male about the "Cloud 9" (marijuana). ARMANDO Angeles and the unknown male then discussed the quality of another

13

marijuana variety and A. ANGELES' reluctance to smoke marijuana because it cut into his profit and claimed that he had now been sober for 4 years. The conversation then turned to Percocet. ARMANDO Angeles said, "Hell no!  I was taking, I was taking some percs (Percocet). But fuck that." ARMANDO Angeles continued, "Nah, not that bad. But I was just taking them. But I had the, I had the link up on them. You know what I'm sayin? I had the link on them to where I was, I was making good profit." The unknown male asked, "You still got that link (a source of supply for Percocet) on them [U/I]?" ARMANDO Angeles responded, "I can get'em, man. But I just try not to fool with'em 'cause it's not even worth it.  You know what I'm sayin?  'Cause… I know out there they're expensive, dude. Those, the… Especially the, the, the baby blues (prescription opioids). The baby blues are 30 dollars out here." ARMANDO Angeles and the unknown male continued talking about prescription opioids and the varieties in demand by their customers.  The conversation then turned to fentanyl.  ARMANDO Angeles said, "I was making me like, on… Each 100 I making me 500 dollars.  Fuck it…Yeah, I just don't fuck with'em no more.  I just kinda like, I push that shit to the side. 'Cause they started, they started making'em themselves out here, dude. And they started putting that, you know that fentanyl in them bitches." ARMANDO Angeles continued, "Hell, yeah! You don't want to get caught with… Man, you don't… You get hit with that fentanyl, nigga!  Woo wee! One of those motherfuckers… One of those pills, one of the fentanyl pills, you gone, brother…A few people ou-, a few people out here dropped on them bitches already, dude… And you can tell when they're, they're, they're 'fents' because, you know, they don't have the, they don't have the original print on'em. They have like an M-30 on it."

43.    On May 14, 2018, approximately at 8:37 p.m., Dat TRAN called an unknown male at telephone number 619-419-9308 (hereinafter "UM9308") (TT9 Session 1050). UM9308 asked if Dat TRAN remembered "the situation that happened between us," and the stuff that Dat TRAN gave to UM9308.  UM9308 made an unsuccessful attempt to jog Dat TRAN's memory with some clues, "remember, the real

14

ones…Blue Shirts…"M&Ms." Dat TRAN said he had been "asking around for that, and…nobody…I think its hot right now." Dat TRAN then asked how many Ms (prescription opioids) that UM9308 still had. UM9308 said "five" (5 milligram pills), maybe 100 or more. UM9308 then asked if Dat TRAN can get the "pressed blues" (counterfeit prescription opioids). Dat TRAN said no and that he had been calling around in an attempt to get them. UM9308 said "they" (third parties) said Dat TRAN was "active for the real ones" (TRAN was actively selling prescription opioids). Dat TRAN replied, "yes, but it ended." UM9308 continued to press TRAN about whether he could obtain the "good ones and the bad ones" (real and counterfeit prescription opioids). UM9308 said the people want them, and they (UM9308 and TRAN) can sell them. Dat TRAN told UM9308 he could not remember who had the hand on the real ones. UM9308 said he (UM9308) did not know, but Dat TRAN got 30 for him last time. UM9308 asked Dat TRAN to try and remember who has the prescription opioids because UM9308 needed a lot of the good ones, and depending on the price of the fake ones he might need 100. UM9308 asked if Dat TRAN remembered the "extra ones." Dat TRAN said yes. UM9308 said he [UM9308] needed those "if the price was right, the extra ones." Dat TRAN asked what price range UM9308 was looking for. UM9308 replied that he needed "his people to try out first" (check the drug quality). UM9308 asked Dat TRAN to give the sample ones, and hopefully "they" (UM9308's customers) will like it. UM9308 asked if Dat TRAN gave it last time at 10 or under (price). Dat TRAN said it was about right. UM9308 asked if Dat TRAN knew anybody had "shroom" Dat TRAN said he did. UM9308 asked Dat TRAN to contact right away to see how much per ounce, and he (UM9308) needed it as soon as possible.

44. On May 14, 2018, approximately at 9:48 p.m., investigators intercepted a text from Dat TRAN to UM9308 (TT9 session 1070). "No go on the shrooms bro and my ppl with the percs haven't replied back yet."

//

//

15

### *Investigators Contact DARREN Tran at Target Location 5*

45.    On December 7, 2017, investigators went to **Target Location 5** and made contact with DARREN Tran in order to interview him about Cynthia Kashiwagi's overdose death. Investigators asked DARREN Tran about Kashiwagi's recreational drug use and he said he did not know anything about it. Investigators asked DARREN Tran about his own admission to the hospital the week prior to Kashiwagi's death. DARREN Tran said it was a drug interaction between Celexa and Adderall. (During a follow-up call with a pharmacy, investigators learned that Celexa and Adderall are safely taken together.) Investigators asked DARREN Tran if he takes pills or if he gave Kashiwagi pills and he denied taking or giving any pills.

### *Investigators Contact Dat TRAN at Target Location 5*

46.    On May 22, 2018, investigators again went to **Target Location 5**. After a few minutes of knocking and announcing themselves, Dat TRAN appeared at the door on the south side of the **Target Location 5**. Investigators asked if DARREN Tran was home, and Dat TRAN said he did not live there anymore.

### *Armando ANGELES' Interview at Target Location 7*

47.    On May 25, 2018, investigators went to ARMANDO Angeles' residence, **Target Location 7**, to interview him regarding Cynthia Kashiwagi's overdose death. Investigators told ARMANDO Angeles they wanted to talk to him about Cynthia Kashiwagi's death. ARMANDO Angeles replied that they must have the wrong person because he did not know anyone by that name. ARMANDO Angeles also denied knowing DARREN Tran, but eventually admitted that he knew DARREN.

### *O'Neil Interview and Controlled buys*

48.    On November 6, 2017, while at **Target Location 5**, Caitlyn O'Neil overdosed. On January 30, 2018, O'Neil told investigators that Dat TRAN gave her a pill while at **Target Location 5**, that he said was a "Percocet" which caused her to overdose. Later, on February 14, 2018, O'Neil met with Dat TRAN at a restaurant. During that meet, Dat TRAN told her that he supplied pills to his brother DARREN

Tran and that the pill on which she overdosed was from the same batch taken by DARREN Tran and Kashiwagi.

49. On March 13, 2018, O'Neil made a controlled cocaine buy for investigators. O'Neil contacted Dat TRAN via text to set up the purchase. At approximately 4:45 p.m., investigators met with O'Neil and searched her vehicle and person for contraband with negative results. Investigators equipped O'Neil with a transmitter/recorder in addition to $1000 for the purchase of one ounce of cocaine from Dat TRAN. At approximately 5:22 p.m., investigators saw O'Neil arrive at **Target Location 5**. Prior to O'Neil exiting her vehicle, investigators saw Eric ANGELES walk by her vehicle from across the street (**Target Location 6** is diagonally across the street from **Target Location 5**). Dat TRAN, O'Neil, Eric ANGELES, and two other males entered the small structure at the rear of the residence. Dat TRAN told O'Neil he lived in this small detached structure. Eric ANGELES handed TRAN a hand bag. TRAN then showed O'Neil a clear plastic bag that came from the hand bag containing the cocaine. O'Neil handed TRAN a white envelope containing $1000.00 and asked Dat TRAN, "A thousand. Right?" O'Neil asked TRAN about "the blues" (carfentanil pills) for a friend to purchase. TRAN responded that he needed to contact his source and get back to her. O'Neil asked, "It won't be from the same stuff you gave the three of us (DARREN, O'Neil, and Kashiwagi)." Dat TRAN laughed and said, "No. It will be better improved." O'Neil left the residence and returned to her vehicle then met investigators and turned over the cocaine and recording device. The DEA Lab determined that the substance was 27 grams of cocaine.

50. On May 4, 2018, O'Neil conducted another controlled cocaine buy from Dat TRAN. O'Neil drove directly from the meet location to **Target Location 5**. O'Neil walked to the rear of the residence to the same structure as the previous controlled buy. O'Neil gave Dat TRAN $1000.00 in the envelope provided by investigators. Dat TRAN handed the cocaine to O'Neil and said that the cocaine came from "off the block" (broken off from a kilo brick of cocaine) per his source of supply. O'Neil left the **Target**

17

1   **Location 5** and drove directly to the neutral location where she provided investigators
2   the transmitting/recording device and drugs. The DEA Lab test determined the drugs
3   to be 27.99 grams of cocaine.

4   ### *May 18, 2017 – 26-gram Controlled Cocaine Buy from*
5   ### *KEOMANIVONG/VIBOUNPHONH/Eric ANGELES*

6   51.   On May 9, 2017, at approximately 2:37 p.m., UC2 contacted
7   KEOMANIVONG via text message in order to arrange for the purchase of one ounce
8   of cocaine. On May 16, 2017, at approximately 12:49 p.m., KEOMANIVONG initiated
9   contact via text message with UC2. KEOMANIVONG texted, "Let me know if you
10  still [want] that." UC2 replied in the affirmative. On May 18, 2017, at approximately
11  12:01 p.m., UC2 initiated communication via text message with KEOMANIVONG.
12  UC2 texted, "Sending my girl (UC3) to pick up dat sample." KEOMANIVONG
13  responded, "Tell her to call me. When will she be here?" UC2 replied, "I told her to
14  call u when she passed Oceanside." KEOMANIVONG replied, "All you want is a
15  sample? I also got a little sample of the China girl (fentanyl)."

16  52.   At approximately 1:55 p.m., KEOMANIVONG (TT2) called
17  VIBOUNPHONH (TT1). KEOMANIVONG asked if VIBOUNPHONH had the
18  sample.   VIBOUNPHONH responded, "The old one or the new one."
19  KEOMANIVONG replied, "the new one."   VIBOUNPHONH instructed
20  KEOMANIVONG to meet at "Eric's" (Eric ANGELES), **Target Location 6**, because
21  VIBOUNPHONH did not have the cocaine on him. At approximately 3:07 p.m.,
22  KEOMANIVONG called UC2. UC2 advised KEOMANIVONG she was passing
23  Oceanside and would be in san Diego in 45 minutes. KEOMANIVONG said he would
24  text UC2 the address. KEOMANIVONG said his friend's place (**Target Location 6)**
25  was located off College Avenue and the 94 by the Walmart.

26  53.   At approximately 3:19 p.m., VIBOUNPHONH (TT1) called
27  KEOMANIVONG (TT2). KEOMANIVONG said the girl (UC2) would be arriving

28

1  soon and KEOMANIVONG was at Eric ANGELES' house (**Target Location 6**).

2  VIBOUNPHONH said he left the "whole" at **Target Location 6**.

3      54.    At approximately 3:21 p.m., UC2 contacted KEOMANIVONG and made

4  arrangements to meet at the Walmart parking lot off of Aero Drive.   Investigators

5  established surveillance at the Walmart parking lot and observed KEOMANIVONG

6  arrive in the Walmart parking lot in a black Saturn.   Investigators equipped the UC2

7  with an audio transmitter/recorder and $1150 in a white envelope. UC2 parked in the

8  Fry's parking lot which is adjacent to the Walmart parking lot.   UC2 contacted

9  KEOMANIVONG and provided UC2's location. KEOMANIVONG handed UC3 a

10  brown paper bag containing one ounce of cocaine. UC3 paid KEOMANIVONG $1150

11  for the ounce of cocaine by handing him the white envelope.  KEOMANIVONG then

12  departed the area and investigators followed him to 3342 Chamoune Avenue, San

13  Diego. The DEA Lab determined that the substance was 26.7 grams of cocaine.

14  ### *November 15, 2016 – USPIS Seize Marijuana*

15      55.    On November 15, 2016, based on information from a USPS mail cover, a

16  U.S. Postal Service (USPS) Inspector discovered that U.S. parcel 9505-5158-1251-

17  6320-0497-08 (hereinafter "parcel") was mailed from the Imperial Beach, California

18  post office and was destined for Maryland. Based on video camera surveillance at the

19  Imperial Beach post office, Inspector Flores identified Armando ANGELES as the

20  sender of the parcel. Maryland USPS Inspector Michael Pecukaitis later obtained a

21  federal search warrant for the parcel.  The DEA Lab tested the contents and determined

22  that the parcel contained 1316 grams of marijuana and 41 grams of hash oil.

23  ### *November 20, 2017 - USPIS Seize Marijuana*

24      56.    On November 20, 2017, based on information from a USPS mail cover, a

25  U.S. Postal Service Inspector (USPI) received information that U.S. parcel tracking

26  label 9505-5138-1258-7322-2098-23 was mailed by an individual that matched the

27  description of Armando ANGELES from the Otay Mesa Postal Store and was destined

28  for Tanya COLEMAN at 107 Old Farm Road, Moor, SC 29369. On the same date,

USPI Flores contacted the Moore, SC postal location to have the package intercepted. Video surveillance from the Otay Mesa Postal store indicated Armando ANGELES mailed the package. Investigators had the package intercepted in Moore, SC and sent back to San Diego for further inspection. A search warrant for the package was obtained and approximately eight pounds of Marijuana was seized and later turned over to DEA.

### *April 30, 2018 – ARMANDO Angeles Intercepted Calls*

57.     On April 3, 2018, at approximately 9:58 a.m., Armando ANGELES placed an outgoing telephone call on TT6 to an unknown male aka "Bobo" at telephone number (310) 467-9844. ARMANDO Angeles asked, "What's up with those pizellz (ecstasy pills)?" "Bobo" replied, "Do you have them?" ARMANDO Angeles responded, "You want me to check on the quads (controlled substance)…You already knocked them down (sold them)?" "Bobo" stated, "Yes, I got eighteen (18 pills) left." ARMANDO Angeles said, "I'm getting some work (drugs) today." "Bobo" asked, "OG (marijuana)?" ARMANDO Angeles replied, "I got rid of some the other day but had to return it because I could not work (sell) with it." "Bobo" said, "Good thing you came across that cutie pie (marijuana). I got it for four-fifty ($450 per pound of marijuana)." Based upon this intercepted call, investigators believe ARMANDO Angeles distributes ecstasy pills, marijuana, and other controlled substances to "Bobo."

### *May 14, 2018 – ARMANDO Angeles Intercepted Calls*

58.     On May 14, 2018, ARMANDO Angeles using TT6, contacted another drug source of supply identified as James CHEWS. ARMANDO Angeles advised CHEWS that he unsuccessfully tried to contact MARK. CHEWS told ARMANDO Angeles that Mark LNU was "putting it together" (weighing and packaging the drugs). ARMANDO Angeles then placed an order with CHEWS. ARMANDO Angeles ordered "a whole one" (one pound) of the "Jet Fuel" (marijuana), one "qp" (quarter pound) of the "black crack" (marijuana) and a "qp" of the "granddaddy" (marijuana). ARMANDO Angeles further stated that is a total of a "whole one and a half" (one and a half pounds of narcotics). Later that evening, MARK LNU initiated a

text message exchange with ARMANDO Angeles using TT#6. During the exchange, Mark LNU asked ARMANDO Angeles when he needed "that" (marijuana order). ARMANDO Angeles stated, "tonight if possible." Mark LNU responded "No prob."

### *May 31, 2017 - VIBOUNPHONH, KEOMANIVONG and TRUONG Conspire to Sell One Pound of Methamphetamine to CS*

59.   On May 30, 2017, UC2 communicated with KEOMANIVONG via text message in order to arrange for CS to meet with KEOMANIVONG for the purchase one pound of methamphetamine. On May 31, 2017, at approximately 1:10 p.m., investigators met with the CS in anticipation of conducting a controlled purchase of one pound of methamphetamine from KEOMANIVONG for $2700.00. Investigators searched CS and CS' vehicle with negative results.

60.   At approximately 1:49 p.m., Investigators observed KEOMANIVONG arrive at VIBOUNPHONH's residence, **Target Location 8**. At approximately 2:43 p.m., KEOMANIVONG departed **Target Location 8**. At approximately 1:53 p.m., CS received a text message from KEOMANIVONG informing the CS that the source of the methamphetamine gets off work at five. KEOMANIVONG texted that he gave it (methamphetamine) to his boy to pick up but he forgot to tell KEOMANIVONG.

61.   At approximately 3:01 p.m., VIBOUNPHONH placed a call from telephone number (619) 362-6135 (TT1) to TRUONG (TT8). VIBOUNPHONH asked, "You still have that load?" TRUONG replied, "What kind?" VIBOUNPHONH responded, "The hat for fifteen (pound of methamphetamine for $1500)...make sure you get the hat (pound of methamphetamine)."

62.   At approximately 4:17 p.m., KEOMANIVONG called VIBOUNPHONH (TT1). KEOMANIVONG asked if VIBOUNPHONH was going to go to TRUONG's house to pick up the methamphetamine. KEOMANIVONG told VIBOUNPHONH to meet up somewhere around the area where the deal was going to happen to avoid having to drive around with the methamphetamine. KEOMANIVONG told VIBOUNPHONH

21

1   to text TRUONG to have her send the address so that KEOMANIVONG and CS could
2   drive to that location. At approximately 5:22 p.m., VIBOUNPHONH placed an
3   outgoing call on TT1 to TRUONG. VIBOUNPHONH said they "needed the hat (one
4   pound of methamphetamine) right now." TRUONG told VIBOUNPHONH she gets
5   off work in a few minutes and will go to her mom (CHHOY) for the one (pound of
6   methamphetamine). TRUONG stated she (CHHOY) was on Altadena Avenue.

7       63.   At approximately 5:58 p.m., KEOMANIVONG placed an outgoing call to
8   VIBOUNPHONH (TT1). KEOMANIVONG asked, "Is she (TRUONG) going to drop
9   it (one pound of methamphetamine) off?" VIBOUNPHONH replied he is waiting on
10   her (TRUONG) call because he was not touching that shit (pound of
11   methamphetamine). VIBOUNPHONH said he was going to **Target Location 6**, Eric's
12   (ANGELES) house and will see what happens.

13       64.   At approximately 6:00 p.m., VIBOUNPHONH received an incoming
14   telephone call (TT1) from TRUONG (TT8). VIBOUNPHONH asked, "Can you grab
15   that (pound of methamphetamine)?" TRUONG replied, "The whole piece (pound of
16   methamphetamine)?" VIBOUNPHONH responded, "Yeah because the dude from LA
17   (Los Angeles) is waiting on us." TRUONG said, "I've got to go to Mom's
18   (CHHOY)…ask…get it (pound of methamphetamine)…and see if she (CHHOY) wants
19   the money first…Do you know the price?" VIBOUNPHONH replied, "twenty-seven
20   hundred ($2700)." TRUONG said, "I'm only gonna need fifteen ($1500) of it."
21   VIBOUNPHONH stated, "Fifteen ($1500) will go to your mom (CHHOY) and we can
22   split the rest because it's Elmo's (KEOMANIVONG) guy from LA (Los Angeles)."
23   TRUONG replied, "I understand…split it three ways."

24       65.   At approximately 6:23 p.m., VIBOUNPHONH (TT1) called
25   KEOMANIVONG. VIBOUNPHONH said, "Her (TRUONG) mom (CHHOY) did not
26   have it (pound of methamphetamine) and needed advance notice. VIBOUNPHONH
27   and KEOMANIVONG discussed how to handle the situation since the CS had been
28   waiting for three hours. VIBOUNPHONH told KEOMANIVONG to make it happen

1  tomorrow.    At  approximately  6:38  p.m.,  KEOMANIVONG  texted  CS  that  she
2  (TRUONG) did not come through but she could come through tomorrow.  CS replied
3  that CS was disappointed but left it open to continue future drug transactions.

4  ### *April 2, 2018 – TRUONG Meets VIBOUNPHONH at Target Location 8*

5  66.    On April 2, 2018, VIBOUNPHONH sent a text message to TRUONG
6  (TT8) at approximately 7:28 p.m. indicating that TRUONG was going to meet
7  VIBOUNPHONH at **Target Location 8**.  Investigators established surveillance and
8  observed TRUONG meet VIBOUNPHONH at **Target Location 8**.

9  67.    On April 3, 2018, at approximately 10:35 p.m., VIBOUNPHONH sent a
10  text message to TRUONG (TT8 session 5180) asking, "Sis can u get any blues?"
11  Investigators believe that VIBOUNPHONH was attempting to obtain controlled
12  substances from TRUONG.

13  ## **BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT**

14  67.    Based upon my experience and training, consultation with other law
15  enforcement officers experienced in drug and financial investigations, and all facts and
16  opinions set forth in this affidavit, I know that:

17  a.    Individuals involved in drug trafficking often maintain the following
18  items in their residences: controlled substances and paraphernalia for packaging,
19  weighing, cutting, testing, distributing and manufacturing controlled substances.

20  b.    Individuals involved in drug trafficking often maintain records of
21  their narcotics transactions and other records of evidentiary value for months or years
22  at a time.  It is common, for example, for drug traffickers to keep pay/owe sheets or
23  other papers of drug sold and monies owed.  Such pay/owe sheets or papers are used as
24  a basis for accounting and for settling existing debts.  Such records are often maintained
25  for a substantial period of time even after the debts are collected.  I have found in my
26  training and experience that such records are invaluable to drug traffickers and that such
27  records are rarely discarded.  Finally, it has also been my experience that such records

28

23

1   and pay/owe sheets also frequently include the names, identities and telephone numbers
2   of suppliers, customers and co-conspirators.

3               c.      Individuals involved in drug trafficking must often rely on others to
4   obtain their drugs and to help them market the drugs.  Frequently, traffickers maintain
5   evidence of the identities of these co-conspirators at their residence.

6               d.      Individuals involved in drug trafficking commonly earn income in
7   the form of cash and try to legitimize these profits.  In order to do this, traffickers
8   frequently attempt to secrete, transfer and conceal the money by means, including, but
9   not limited to: placing assets in names other than their own to avoid detection while
10  maintaining control; laundering the money through what appears to be legitimate
11  business or businesses; hiding money in their homes, safes and safety deposit boxes; or
12  using the money to buy assets which are difficult to trace.  Records of these and other
13  types of transactions are often found at the residences of individuals involved in drug
14  trafficking.

15              e.      Individuals involved in drug trafficking often keep and maintain
16  large amounts of United States currency at their residences.  Such funds are often used
17  for everyday expenditures and to maintain and finance their ongoing drug business.
18  Additionally, individuals involved in drug trafficking often amass and maintain assets
19  at their residence which were generated by their trafficking activities, or purchased with
20  the cash earned from such trafficking.

21              f.      Individuals involved in drug trafficking often maintain weapons,
22  firearms and ammunition on their person or in their residence and/or vehicles.  Such
23  weapons and firearms are used, and can be used, as an instrumentality of the crime of
24  possession and distribution of drugs and firearms.  Furthermore, I am aware of instances
25  in which traffickers have maintained such items in their residences and vehicles in order
26  to protect themselves and guard their drugs, firearms and profits, as well as for
27  enforcement purposes during their drug and firearms dealings.

28

24

g.    Residences and premises used by individuals involved in drug trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

h.    Drug traffickers commonly use cellphones, blackberries, PDAs, other personal handheld electronic devices, and laptop and desktop computers to communicate with, among others, their customers, their suppliers, and other criminal associates and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their drug trafficking activities. Drug traffickers also commonly store records of the business of distributing and selling drugs, on computers and computer discs, diskettes, cassettes, tapes, and other forms of digital media. Drug traffickers commonly maintain these items on their person and/or in their residences and vehicles.

i.    Individuals involved in drug trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter surveillance upon law enforcement authorities, and usually maintain these items on their person and/or in their residences and vehicles.

j.    Individuals involved in drug trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with drug proceeds or property utilized to facilitate drug trafficking activities. Such items are typically maintained in their residences. Drug traffickers often store information relating to their drug trafficking business on their cellular telephones, PDAs, computers and/or computer disks.

## CELL PHONE SEARCH WARRANT METHODOLOGY PARAGRAPH AND ATTACHMENTS

### Procedures For Electronically Stored Information.

68.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is

25

1 | subscribed and the nature of the data stored on the device. Cellular devices today can
2 | be simple cellular telephones and text message devices, can include cameras, can serve
3 | as personal digital assistants and have functions such as calendars and full address books
4 | and can be mini-computers allowing for electronic mail services, web services and
5 | rudimentary word processing. An increasing number of cellular service providers now
6 | allow for their subscribers to access their device over the internet and remotely destroy
7 | all of the data contained on the device. For that reason, the device may only be powered
8 | in a secure environment or, if possible, started in "flight mode" which disables access
9 | to the network. Unlike typical computers, many cellular telephones do not have hard
10 | drives or hard drive equivalents and store information in volatile memory within the
11 | device or in memory cards inserted into the device. Current technology provides some
12 | solutions for acquiring some of the data stored in some cellular telephone models using
13 | forensic hardware and software. Even if some of the stored information on the device
14 | may be acquired forensically, not all of the data subject to seizure may be so acquired.
15 | For devices that are not subject to forensic data acquisition or that have potentially
16 | relevant data stored that is not subject to such acquisition, the examiner must inspect
17 | the device manually and record the process and the results using digital photography.
18 | This process is time and labor intensive and may take weeks or longer.

19 |      69.    Following the issuance of this warrant, I will collect the subject cellular
20 | telephone and subject it to analysis. All forensic analysis of the data contained within
21 | the telephone and its memory cards will employ search protocols directed exclusively
22 | to the identification and extraction of data within the scope of this warrant.

23 |      70.    Based on the foregoing, identifying and extracting data subject to seizure
24 | pursuant to this warrant may require a range of data analysis techniques, including
25 | manual review, and, consequently, may take weeks or months.  The personnel
26 | conducting the identification and extraction of data will complete the analysis within
27 | ninety (90) days of the date the warrant is signed, absent further application to this court
28 | //

## **PRIOR ATTEMPTS TO OBTAIN DATA**

71.    The United States has not attempted to obtain this data by other means.

## **CONCLUSION**

72.    Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all the facts and opinions set forth in this affidavit, I believe that the items set forth in ATTACHMENT B (incorporated herein by reference), which evidence violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute Controlled Substances); Title 21, United States Code, Sections 841(a)(1) (Possession of Controlled Substances with intent to Distribute); as set forth above, will be found at the **Target Location**s more fully described in ATTACHMENTs A-5 through A-9.

73.    Because this is an ongoing investigation and premature disclosure of the investigation could endanger agents and officers, cause the target subjects and others to flee, and cause destruction of evidence, I request that this affidavit, the application for the search warrant, the search warrant, and all other associated court records be sealed until further court order.

Leo Tanlu, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me

this ___ ɩ 6 ___ day of March 2019.

Honorable Bernard G. Skomal
United States Magistrate Judge

27